Good morning, Matthew Goldstein Farring and Metcalf on behalf of the appellants to Dave Scheer Gun Companies, Barbara Gnyshyn and Robert Thorne. I'd like to reserve five minutes for rebuttal. That's fine. Thanks. The Dave Scheer Gun Companies, who I'll refer to collectively as Dave Scheer, operate retail stores in South Africa. This case is about the State Department's smearing of Dave Scheer's name. It's about the State Department sending written notices to Dave Scheer's suppliers and competitors in the United States and South Africa that imply that Dave Scheer has somehow violated the law or other aspect of U.S. foreign policy. Dave Scheer has lost goodwill. It has received letters from suppliers that they can no longer deliver certain items to Dave Scheer. All appellants are asking for is due process, a chance to clear their name. And so we have three types of claims at issue on this appeal. We have a stigma plus claim under the Fifth Amendment being asserted by Dave Scheer and Barbara Gnyshyn. And we have Administrative Procedures Act and ultra-viewers claims being asserted by all the appellants. Now, without oral argument... Oh, let me ask you something. Robert Thorne is the only one of these people who is in the United States. Is that right? That's correct. But he is not bringing the constitutional claims. No, he's only bringing an Administrative Procedures Act. We are not appealing the Fifth Amendment claims that he's bringing in the lower court at this time. That seems a little backwards in the sense that he's the only... I mean, the others have a major problem as to whether they have the constitutional claims to raise, right? Well, Your Honor, I respectfully disagree. I think it would be great if we were asserting some other claims on behalf of Robert Thorne, since he clearly is a U.S. citizen. His daughter is a U.S. citizen, and we believe that we have more than significant voluntary... So, as a result, we have this other issue that comes into the case, which is... I don't think it's properly called a standing question. It's a merits question of whether these individuals have any due process rights to be asserted. Yes, Your Honor. I apologize in the briefing. We kind of look at that as an injury in the Article III analysis, but it is more properly brought as an issue. Do they have... Does respond to that. The Fifth Amendment, as far as asserting constitutional rights of a non-resident alien, there's no bright-line rule anymore. Eisentrager has been replaced insofar as it held that or was thought to hold that. Citizenship is not a prerequisite, nor are jurisdictional boundaries borders. The court, this court, is looking to the substantial... I'm sorry, the significant voluntary connections test of Verdugo-Ortiz, as well as the functional approach of Boumediene. We listed several significant voluntary connections that Dave Scheer has with the United States, and we also supported that with case law, showing the relevance of the significant voluntary connection analysis. We explained how Dave Scheer guns has over $130,000 in inventory stored in the United States with Mr. Thorne. Now, title to that would transfer were not for the debarment in this case. So I don't think that the State Department gets anywhere by saying, well, you don't have title to it. The fact of the matter is the only reason that there's no title to that is because of the State Department's actions. And we cite the Russian volunteer fleet case, as well as the National Council for Resistance in Iran, which recognizes that having a property interest in the United States or contracts commitments in the United States can be sufficient to establish voluntary connections of an NRA and a right to establish Fifth Amendment or other constitutional protections. We also note how Dave Scheer completed multiple DSP-83 non-transfer and use assurances that are required by the Department of State. Now, this has been portrayed in briefings as an end-use statement between Thorne and Dave Scheer, and that's not true. The DSP-83 form, the Department of State pro forma form 83, is required for all transfers of firearms by the Department of State because those are classified by what we call significant military equipment. And those forms require that the foreign end-user certify under penalty of perjury, basically 28 U.S.C. 1001, that they will not re-export or re-transfer the items being exported that are listed in that 83 without U.S. government approval. They subject themselves to U.S. jurisdiction by making that statement. And if there's a diversion, the State Department can go after them. And they have done that. And we cite a case in your honor in the briefs the State Department went after an Australian, an Austrian, sorry, Austrian non-resident alien who never stepped foot in the U.S. before this case, before their case. And they used the DSP-83 as evidence at trial to show, I believe it was intent. But these forms are used by the Department of State for a specific reason, to extend jurisdiction. And it's, it'd be patently unfair, and this would be unfair in this case, to say, well, the State Department can require that Dave laws and make a certification that they're held to under federal law, that they won't re-transfer, they won't divert these items. And then the State Department turns around and says, we believe you diverted the items. And we have this DSP-83 by the way, but we're not going to let you have any due process in our determination that you violated what you stated you would do in this DSP-83. We think the DSP-83 in of itself is sufficient to establish proof that they avail themselves, that they obligated themselves voluntarily to significant societal obligations with the U.S. to establish a significant voluntary connection. And we also cite the frequent visits to the U.S. by Dave Shearer employees to include over 20 visits by Gareth Donation, its principal. He visited so much, he had to get an apartment here. And we cite the case of Martinez Aguero that states that regular unlawful entry into United States and submission to U.S. law is sufficient to establish a significant voluntary connection. We also note that a U.S. citizen, Barbara, has ownership interests indirectly to a trust of the Dave Shearer entities. And actually that interest does reflect in the record is 75% U.S. owned between the U.S. beneficial, the beneficial interest is 75% owned by U.S. persons, 50% by Barbara. Back up a minute. Substantively, does all your claims depend on there being the debarment? I don't think that there has to be a finding of debarment to find that there's due process here. I think that what we are obligated to show the court and which is reflected in the record and the district court, one of our points of error, is that the actions by the Department of State go well beyond a case-by-case licensing decision. Now, whether you want to call it debarment or suspension, that is not authorized by the provisions they cite. And it's a penalty that the Department of State's own website acknowledges. It says that exclusion from the activities involving the ITAR, the International Traffic and Arms Regulations, constitute debarment. And debarment is handled in that one section, part 127. And it's interesting because even the U.S. ordinance case, which the government cites in its briefs, which is apples and oranges to the facts of this case, acknowledges that a case-by-case licensing decision, a denial, that's a preliminary decision and that's not a penalty. But actions beyond that, that for enforcement purposes, are debarment. And if we look at the government contract cases, you'll see that debarment is also considered, it's fairly met in this case, because in the debarment context, it's a system-wide exclusion of the bidders from being able to bid on contracts. I have a question. What's your ultimate goal here exactly? Thank you for asking, Your Honor. Our goal is due process. We don't need a license. We don't want a license. We're not asking for a license. I'm sorry? You don't want a license? I mean, not in this action? Not in this action, no. Now, all we're asking for is process. And the procedures that are already outlined in the ITAR for debarment proceedings and other hearings, but that's all we want. Any order from this court will not impact those proceedings. We may not succeed in the administrative process and never get a license, but if we succeed, my clients assuredly want to be able to apply for another license and get a fair shake at that. Did the government say that you could? They have not applied for another license. I'm sorry, Your Honor? They have not, in fact, applied for another license. Well, Your Honor, there are some things that have happened since this action has occurred, which are outside the scope of the record. But as far as the record is concerned, we have not. And as far as the... Is Your Honor looking at... I'm sorry, if the Honor has any follow-up questions. No, go ahead. So, to go back to the structure of the case and how the pieces fit together, if it's Thorne, he is still involved in the APA and Ultravera's claims, right? Yes, he still maintains those claims. Those also depend on the department assertion. Yes, they work on the department assertion because under the APA, his presence within the zone of interest is that he's a licensed applicant. He pays the yearly fee with the Department of State to be registered and submit licenses. He has a reasonable expectation, as do most, that the agency will follow its own regulations in processing those licenses and not deny a license for something that is not lawful under the ITAR itself, such as the de facto model. It's not his license, right? It's his license. He applies for licenses. He's the U.S. person that applies for licenses. So, he was the one who had his licenses denied? Yes, Your Honor. Because they weren't reliable people? Yes, that's their allegation by the Department of State. He directly has his license denied and he has a direct claim under the APA, is your assertion. What I'm trying to find out is whether there's some claim in this case in which it is undeniably here and the question is whether there was a debarment or something that gave rise under the regulations to the procedure. And you're saying yes because Thornton was the one who had the licenses denied and who was complaining that there was a debarment and he should have had a license. Is that right? He has an interest in the licenses being processed properly and if the agency follows those processes, they would have given the process not to him, but to Dave Scheer. Why? Because Dave Scheer is the target of the Department of State's penalties. Dave Scheer is the entity that appears in these provisos that are being sent to every end user of commercial firearms being exported from the U.S. stating that you cannot re-export, you cannot re-transfer this to Dave Scheer Guns because of U.S. foreign policy reasons. Oh and by the way, Department of State reserves the right to deny any re-transfers of licenses if someone violates a criminal law or other foreign policy interest. That's the issue and that's one of the top level actions by the Department of State that shows debarment has between Thorn and the procedure that he's seeking because he isn't in fact himself seeking the procedure for himself. He's seeking that the agency comply with its regulations. He says an APA claim for unlawful process. So he's not challenging the fact that they denied his license. He's challenging the fact that they failed to follow their own process in adjudicating his licenses. Now the Dave Scheer Guns claim is much more broad. They have the stigma plus claim. They also have their APA claim that if the agency is taking actions outside of a case-by-case licensing decision, 126.7, the section they cite doesn't apply. They have to go to part 127 which is for penalties and in order to oppose the penalties, a suspension, other aspects of the debarment, they need to go through the process at part 128 which allows them with notice, an opportunity to be heard and other due process protections. Now it's important to keep in mind the scope of the actions we're talking about. The district court found that all licenses were just a case-by-case licensing decision. A case-by-case licensing decision, that's when you look at the application, you review the issue. Did the government say that they would consider future applications? Yes, your honor. In most of these types of debarment cases, the government says they didn't debar someone. If you look at the government contract cases, that's the common theme. We didn't debar anyone but the court looks the practical and legal effects of the government actions. At the district court, in order to determine whether or not there was debarment, the district court judge appears exclusively to the affidavit, the declaration of Katherine Hamilton who's the director of DTC licensing and she says there was no debarment. Well, that's the only thing I see setting the record for his decision that there was no debarment was her statement. That was a declaration prepared after litigation. It expressly states it's prepared to support the state department's response to a motion from injunction. They granted the applications in past days, didn't they? Past years and so forth. Yeah, 2014 to 2017, they granted over 60 licenses. In some cases, they did them in a day or less, basically a day, really short processing. It's just all of a sudden, beginning in early August of 2019, they stopped processing the licenses and then returned 12 of them or rejected them, denied them in August of 2019. We brought the action shortly after that. What was the reason for that, did they say? Did the director of Hamilton say that? Your client was dealing with bad people over there in South Africa or some other place, terrorists and that sort of thing. But there's nothing else in there as far as information based upon that allegation that he committed the crime, the very crime that the DSP-83 says that we certify we won't do, that Dave Scheer signed. They said that you're unreliable, didn't cross the board, a suspension of all licenses. They began sending these notices to third parties in the U.S. that said, the exporters saying, you have to tell the end user that foreign policy reasons prevent you from giving this Dave Scheer guns and we reserve the right to restrict licenses based upon violations of U.S. law and foreign policy. You also have to each end user sign a written acknowledgment that they've read this and upload it with your license file. The State Department is not only sending this information to the suppliers and competitors, they're requiring it to be publicational. I'm curious, what kind of weapons were these? Were they just backyard weapons or were they big assault weapons or tanks or it's, these are items that were subject to ITAR control and they were basically retail firearms. They were firearms sent for commercial resale in South Africa to police officers, security guards and licensed members of the public. So the statement was that certain entities in the license application are no longer reliable recipients. And Hamilton declaration seems to say that that was a short-term decision or not necessarily a permanent decision or what? Yeah, she's saying that, well, I didn't mean to say presumption of denial. There is no across the board licensing denial for them, but that's the problem with the arms of the ITAR is for case-by-case licensing decisions. The statutory authority in the Arms Expert Control Act that that implements refers to each license. It's case-by-case. It doesn't authorize any suspension of license, publications to third parties, certainly doesn't authorize their designation of Dave Shearer on an internal agency blacklist that they're sharing with the Department of Commerce. Those actions go well beyond any case-by-case licensing decision. You assert that there's such a blacklist. I'm sorry? I guess you assert that there's such a blacklist, but do you have any proof that there was such a blacklist? Yes, Your Honor, we have proof. Catherine Hamilton's affidavit in the district court, which is part of the record, talks about, they call it a watch list, but as she describes in her declaration, the watch list is for known weapon proliferators, diversion, people have been committed to crimes. It's a derogatory list. And we cite some GAO provisions that the court can take judicial notice of that shows existence of a list, how the Department of State's list is derogatory in nature, and how it is being shared with the Department of Commerce. There's publications. Your Honor, I'm short on time, but I can give you those sites if I have some time for questions from the court. I'd like to reserve some time. All right, we'll give you a minute. Good morning, Your Honors. I may have pleased the court. Christopher Bates for the police. This case involves applications for the export of hundreds of firearms and thousands of pounds of ammunition to arms dealers located in South Africa. In a series of adjudications, the department determined to deny the applications based on a determination that doing so would be in furtherance of world peace, or national security, or foreign policy of the United States. But what she said was that certain entities are no longer reliable recipients. And then she put into these letters, and other letters to third parties, that there was a list of people that they couldn't sell the arms to. I mean, that sounds like a permanent determination. It doesn't sound temporary. What's temporary is there's no longer reliable recipients, which seems to say, not for today, but permanently. So, as Your Honors have been discussing with Mr. Goldstein, the department has submitted in its declaration that it will continue to consider these applications on a case-by-case basis. But if they're no longer reliable recipients, then they're no longer reliable recipients. She doesn't say that. That sounds like a status. So, it made these determinations based on the information before it. We don't know the exact nature of the information. This is, of course, an area that implication of securing foreign policy. And so, there are some on that. But it made those determinations based on the information before it. If that information were to change in the future, those decisions could reach different results. And I think it's important to clarify for the court as well. So, there's been a lot of discussion today about debarment and the plaintiff's allegations that certain of the plaintiffs have been debarred because the license applications in this case were denied. Debarment is about much more than just the ability to serve as what's called an end user or to be the ultimate recipient of a license application. When the department debars an entity, that applies to the entity's ability to sell, to manufacture, to serve as what's called a freight forwarder or shipper, to serve as a broker. There are many activities that are submitted, evidence that these unreliable recipient determinations mean that they can't undertake these other activities. So, they're trying to narrow in on this one aspect of what takes place under the ITAR and have argued they've been de facto debarred based on that one activity. But debarment extends far beyond that. So, when the department says that there's been no debarment here, it's not just with regard to the somewhat narrow activity here of serving as the end user. It applies to many activities as well. In addition, when an entity is- Well, but all they were doing was acting as an end user. I mean, that seems to me to mean that it would apply to people who do all these different things. But these people don't do all these different things. They just do this one. So, as to what they're actually doing, I just have a hard time understanding why saying somebody is no longer a reliable recipient, leave out the presumption thing when she says she didn't mean that, is a determination of their status that they're not- And it's not- In other words, this is not a determination that as to this particular license, they're going to sell it to somebody else. We're not going to give you this license. It's that these people are not reliable recipients. And the only way you would change that is to, I guess, disprove whatever the original determination was, even though you don't know what it is. But you wouldn't change it by anything happening in the future because that's not what it's based on. Again, Your Honor, it could depend on if the information that the State Department based the determination on changed. That would be one basis that it could change in the future. But going back to what I was trying to clarify before, merely because an entity has been determined to be an unreliable recipient doesn't mean they can't do any of the other number of things that the Department would prohibit. So that doesn't mean that they couldn't be necessarily a broker or a freight forwarder. And so, again, the Department is not just about serving as an end user. And their claim is that the Department has debarred or effectively debarred them by denying 11 license adjudications. The Department extends much further. In fact, when the Department has debarred an entity, it won't even consider applications on behalf of that entity. And the Department here has clearly stated that it will continue to consider applications on a case-by-case basis. In addition, when an entity is debarred, it extends further up the chain as well. Other exporters are not allowed to export the entity's goods or annoyingly integrate aspects of the entity's goods in their exports. Now, the plaintiffs here, at least the record doesn't indicate that they participate in those activities. But I'm really trying to explain that the Department is much broader than merely serving as an end user, which is the factual scenario here. What would be the appellant's remedy? Say we applied multiple times and each time it's denied. What would be the remedy? Do they have enough information to what point does the appellant have some form of remedy to try to rectify the situation? So, an applicant whose license is denied has an ability to seek reconsideration of the decision. The plaintiffs do not take advantage of that here. So, that's the remedy that is set forth in the ITAR with regard to license denials. So, with regard to applications in the future, they could seek reconsideration based on the information that's provided in those future applications and attempt to change the determination there. But they don't have any information about determination with this name. All they know is that it was determination, that he's no longer a reliable recipient. How are they supposed to ask for reconsideration of that? Yes, he is a reliable recipient. They don't know why it was determined that he wasn't a reliable recipient. They could submit information about the processes and procedures that they have for ensuring compliance with ITAR requirements about ensuring that goods are not diverted. They could submit information about their past practices, their past sales to the Department. You know, submit information about the checks that they engage in to ensure that the products are not diverted. And, you know, one point that maybe I mentioned here as well in response to Judge Lee's question, this is a point that we mentioned in our brief, is that the ITAR provide a procedure for the licensed applicants to seek reconsideration and have certain appeal procedures. But it doesn't provide those procedures for foreign end users. So, for companies in other countries that are seeking to be the purchasers, it doesn't provide those procedures for those end users. And I think it's important to emphasize here as well. So, plaintiffs have talked a lot, both in their briefs and here today, about due process and about the importance of ensuring that have process to clear their names and so forth. But it's important to bear in mind as well what the scenario is here. These are foreign end users in a foreign country, South Africa, who are interested in and attempting to traffic in arms for purposes of profit. And courts have consistently held that a party's interest in the ultimate market disposition of goods, whose import or export is subject at all times to an agency's regulatory power, that that doesn't create a protectable property interest under the Fifth Amendment. Two cases that we cite are Mitchell's Arms and B-West. So, this isn't a case like, you know, maybe where you had a business here in the United States who was seeking a license to operate their business and something happened with that. This case is about arms dealers located in a foreign country who are seeking to, you know, import goods from the United States to their country. And so, to the extent that there are questions of due process that come up with regard to license applications and license adjudications, it's important to remember, as I mentioned, the courts have consistently held that a party's interest in importing or exporting where it's subject at all times to the possibility that the application could be denied whenever the government agency decides doing so is in accordance with world peace, national security, otherwise advisable, but that doesn't create a protectable property interest. But as a matter of regulation, the person applying for the license who, in this instance, was storing the American, was it in the United States, can file for reconsideration, right? That's correct, Your Honor. And B, if there is a government, including constructive one, do the procedures in the regulation apply to the end-users? Do the procedures regarding appeal, do the agency's procedures regarding appeal, I'm sorry, regarding debarment apply to end-users? I'm sorry, could you repeat that, Your Honor? Including in foreign countries. So, my understanding, Your Honor, is that the department has, in the past, debarred end-users and that when it has done so, it's done so according to the procedures that are set forth in the regulations. The answer is basically yes. That, yes, yes. If the agency undertook debarment, that it would follow the procedures that are set forth. They're bringing an administrative action under the EPA claiming that there was actually a debarment and that they're entitled to the procedures for a debarment. There's no extra territory out. And there's no problem of whether they have a property interest. Whether they were properly what, Your Honor? Whether they have a property interest. In other words, I understand what you were saying before is that there's no property interest in being able to continue to import these guns. And also, these people are not in the United States. You didn't merely make this argument in your briefs. These people are not in the United States and don't have a connection. But that doesn't affect the viability of the APA claim. Is that if they had an APA, insofar as they are claiming that they were functionally debarred and they want to proceed under the ITAR proceedings, they can do that? So, Your Honor, we would also say that they lack prudential standing to do that. We argue in our brief that, so, the purposes of the AECA, which is the statute that governs ITAR, is to promote world peace, the national security interests of the United States, and the interests of foreign end users who are seeking to traffic in foreign arms for purposes of profit, we would say are so marginally related to the interests of Congress in passing the AECA that they would not have intended to permit them to bring suit. You told me before that if there was a formal debarment, those people could, in fact, proceed. Oh, I'm sorry, Your Honor. I thought you were asking if the agency decided to debar an end user, if they would follow those procedures. Right. So, if there's no prudential standing, and then they couldn't bring an APA action nonetheless? So, if they formally debarred them, but said, we're not going to give you the your position that they couldn't bring an action saying you have to do this procedure? That's correct, Your Honor, that they're outside the zone of interest of the AECA. Even though the agency, but how can they be outside the zone of interest when the agency, in fact, provides the procedures to these people? I mean, the agency, I'm, maybe I'm unfolding, but the fact that the agency, you know, follows certain practices doesn't necessarily give rise to an APA claim for individuals who are outside the zone of interest of the statute. So, you know, so the fact that the agency may do certain things doesn't bring somebody who would otherwise be outside the zone of interest of the statute within the zone of interest of the statute. But the procedure is meant for these people. That's why it's there, no? It's to deal with the fact that if they debar a arms exporter, they have some procedures and it's construed that way. I'm really, I mean, I understand everything else you're saying. I don't understand this part. So, okay, maybe I'm misunderstanding, Your Honor, as well. So, we've argued, obviously, that there's no debarment here. The debarment means much more than, you know, the ability to serve as the end user on a license. So, the question is, do we have, is this something that we decide or do we say you can't bring that case because of prudential You're arguing that they can't bring that. Can Thorne bring that case? So, we don't dispute Thorne's standing to bring a suit challenging the license adjudications. We think that that would fail for other reasons, but we don't dispute that he would fall within the zone of interest of the statute. The statute does, in answer to Judge Lee's question earlier, I referenced the procedures for seeking reconsideration the ITAR does provide procedures for licensed applicants to seek reconsideration. It does not provide procedures for foreign end users to seek reconsideration. In fact, in the provisions of ITAR that set forth the administrative procedures regarding penalties and that set forth violations of the AECA and ITAR, the term end user doesn't apply, it doesn't appear anywhere in 22 CFR 128, which is the part that sets forth the procedures for debarment and other administrative penalties that appears once in 22 CFR 127, which is the provision of ITAR, the part of ITAR that sets forth information regarding violations and so forth. So, a person in Thorne's position, as the licensed applicants here in the United States, we don't dispute that he would fall within the zone of interest and be able to bring a suit challenging license adjudication, but for foreign end users, license adjudications, but for the plaintiff companies here, which are foreign that the entity to which he was exporting had been functionally debarred and improperly without procedures. Well, that's merely a recasting of the agency's substantive decision to deny the license adjudication. So, under ITAR, the agency can deny a license when it deems doing so is world peace, national security, foreign policy, or when it deems it advisable. And so, that would merely be an attempt to recast a determination by the agency to deny the license for one of those reasons as, you know, for some other reason. And if I can just briefly discuss your honors about the alleged blacklist that Mr. Goldstein has referenced. So, it's not a blacklist. The Department of State refers to it as a watch list, and it's a list that has certain entities on it that are flagged for further review. Presence on the watch list is not an automatic ding or does not automatically result in a denial. Director Hamilton discusses this in her declaration. I believe it's at pages 159 through 160 of the record that when an entity is flagged on this watch list that the agency then undertakes further review. And in fact, Director Hamilton expressly says that as a result of the review, what's called the action officer may clear the flagged person and provides a couple examples of when it may happen that the action officer would clear the flagged person. That would be if the action officer were determined that there is, in fact, not a significant risk of aversion, or if the information that resulted in the flag is no longer relative or determinative. So, this internal list that Mr. Goldstein references is not an automatic bar to receiving a license. It's merely a watch list that then results in further review. I have a question. Yes, your honor. If we uphold the district court in denying a preliminary injunction, is there any further activities in this case, or is there anything on the merits that would be tried? Not, well, so I suppose that the plaintiffs could move forward and seek a permanent injunction in the case. You know, that would perhaps be an unlikely result, given the fact that the court issued a preliminary injunction. With regard to the plaintiffs' actions in the future, so this case is about, I believe it's 11 license applications. They could submit license applications in the future. Now, as we discussed at the end of our brief earlier this year, jurisdiction over the sorts of items that are at issue in this case was transferred from the Department of State to the Department of Commerce. So, if in the future plaintiffs, you know, sought to export the sorts of items that are at issue in this case, it seems likely that those applications would go to the Department of Commerce. So, with regard to the applications that are at issue here, plaintiffs could certainly, you know, seek to proceed forward to final judgment in the district court below, although that might be unlikely given the district court's decision on an injunction. Okay, thank you very much. Thank you, Your Honors. Yes, sir. I'm not hearing. You're muted. Yes, Your Honor, sorry about that. The citations to the Barbara, the Catherine Hamilton affidavit that I was referring to are going to be on pages, I've got 16 and 49. I'm sorry, the 159, paragraph 16 on 159 and paragraph 44 on, I mean, the excerpts of record at 167. And when you look at this, it's interesting to see because the Department of State is not seen to be contesting at all whether they're on the list. They're contesting the characterization of the list. They call it a watch list. We call it a blacklist. And this is why, when you look at Catherine Hamilton's affidavit, it explains who's on this list. Companies and persons suspected of participating in illicit diversion of sensitive goods, persons who have failed end-use checks. And the end-use checks are the Blue Lantern checks. And other parts of the record recite to state about how when someone's got a, fails a Blue Lantern test, they're put on this blacklist. The other issues that we see that the State Department is raising all relies on this court making a determination that all the State Department actions to include these publications to third parties who submit licenses that don't even name Dave Shears on the license applications. But all that in a blacklisting is part of a case-by-case license review. That's why they raise reconsideration. You just walked over that. What do you mean it doesn't name a Dave Shears? Name somebody as the recipient, no? They named someone. It's not Dave Shears. Dave Shears is not involved in those transactions at all. And yet the State Department, for every export license of firearms that they issued, and now for this Commerce Department, we believe that the administrative record will show at the direction of the Department of State, they're going ahead and putting these notices on every license for export to South Africa involving commercial resale. And if you look at the actual proposed rule transferring the files that they talk about, the jurisdiction of the firearms, it notes that the Department of State had, I believe it was 10,000 licenses for firearms they processed in 2018. What proportion of those are going to South Africa? How many of them are going for retail end users? Those all not only have the provisos in the license, including my client, the State Department's requiring that they republish those by getting acknowledgments from every end user in South Africa, competitors, customers, suppliers, and my client that see this information have to acknowledge that that will not retransfer the firearms because of foreign policy interest. And that statement from the Department of State's on the agency letterhead. The case by- But I didn't understand what you said about the license does not have the Dave Shears interest. What is the license for? What is application for the license? Doesn't it say I'm going to sell it to so-and-so? Yeah, you might have ABC Sports in the U.S. exporting to XYZ Sports in South Africa, and they might have a list. They might say end users are members of the retail public. That doesn't involve Dave Shear at all. Dave Shear wasn't a part of that transaction. It's not listed in the license materials. Yet the State Department in response to that license, when they grant it, will say, cool, you can go do it. Just we want to let you know, these two paragraphs on there, they call out Dave Shear. They say that you can't send this stuff to them for foreign policy. But Thorne's applications did name the Shear entity. Thorne's applications did name the Shear entity. Yes, and those were just denied. There were 12 of them. You were very confused. Go ahead. I apologize, Your Honor. The reconsideration request process that Mr. Bates is talking about, that's for licenses. That's for the case by case review. That's why on that you don't have any right to due process. You don't get notice of the reasons for the denial other than these conclusory statements that we've determined that you were an unreliable end user. That's all they get. They could submit information that goes up the chain to the director, maybe to the deputy undersecretary, but that's all they get. There's no notice. They don't know what to respond to. There's no process. There's no impartial administrative law judge. That is all included in the Part 128 process when they do something above and beyond a mere license denial in a case by case situation, which we have here. Okay, you're well out of your time, so thank you very much. Thank you both for your argument. And the case of Thorne versus United States Department of State is submitted, and we will go to the last case of the day, which is public watchdogs versus U.S. Nuclear Regulatory Commission.
judges: Siler, Berzon, Lee